**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CORNELL GARDNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 07 C 5083 |
| ) | |
| MICHAEL J. ASTRUE, ) | Judge Nan R. Nolan |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cornell Gardner claims that he is disabled due to asthma and mental problems. He filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment. For the reasons set forth here, Mr. Gardner's motion is granted in part and denied in part, and the Commissioner's motion is denied.

## PROCEDURAL HISTORY

Mr. Gardner applied for DIB and SSI on January 20, 2004, claiming that he became disabled on January 6, 2004 due to asthma, hypertension, hepatitis C and depression. (R. 68-70.) The application was denied initially on April 19, 2004, and again on reconsideration on November 10, 2004. (R. 31-35, 40-43.) Mr. Gardner appealed the decision and requested an administrative hearing, which was held on May 30, 2006. (R. 44, 441.) On August 23, 2006, the Administrative Law Judge ("ALJ") denied Mr. Gardner's claim for benefits, finding that he is capable of performing a significant number of light and sedentary jobs available in the national economy. (R. 21-28.) The ALJ found that Mr. Gardner's asthma, hypertension, major depression, panic disorder and history

of polysubstance dependence in full sustained remission since 1997 are severe impairments. The ALJ concluded, however, that Mr. Gardner retains the residual functional capacity to perform simple, routine tasks at a non-production rate pace, as long as he avoids all exposure to extreme temperatures; concentrated exposure to high humidity and wetness; and even moderate exposure to pulmonary irritants, including perfumes, soldering fluxes, solvents, cleaners, fumes, odors, gases and dust. (R. 24.) Mr. Gardner now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

**FACTUAL BACKGROUND**

Mr. Gardner was born on July 17, 1960 and was nearly 46 years old at the time of the hearing before the ALJ. (R. 68.) He has a high school education, attended college for a year and has nine months of automotive training. (R. 449.) Mr. Gardner's past relevant work is as a welder. (R. 450.)

**A.     Medical History**

**1.     2002 through 2003**

Mr. Gardner began receiving treatment for breathing problems at least as early as April 2002. Dr. Toshiko Uchida's treatment notes from the John H. Stroger, Jr. Hospital ("Stroger Hospital") are difficult to decipher, but it is clear that on May 14, 2002, Mr. Gardner underwent a pulmonary function test ("spirometry"), which showed mild to moderate obstructive disease, with air trapping noted on the volume/time curve. (R. 181-83.) Throughout 2002, Mr. Gardner sought emergency care on several occasions, receiving treatment for at least two bouts of acute bronchitis and an asthma flare-up. He was prescribed Prednisone, Albuterol, Azmacort, Flonase and Serevent for his asthma and allergy symptoms. He also took Enalapril for hypertension. (R. 168, 176, 178, 297-302.)

Between January and June 2003, Mr. Gardner presented to the University of Illinois at Chicago Medical Center ("University of Illinois") on six occasions, complaining of symptoms

including right side pain, asthma, an upper respiratory infection, acid reflux, a chronic cough, and shortness of breath associated with exposure to paint fumes in his bathroom. (R. 248-61, 277-86.) As of April 8, 2003, Mr. Gardner was still using his Albuterol inhaler and Azmacort, and he started taking Advair for his asthma as well. (R. 248-49.) On both June 16 and July 16, 2003, Mr. Gardner returned to Stroger Hospital. Dr. Uchida's treatment notes indicate that Mr. Gardner was seeing a pulmonary specialist at that time and taking Advair. He refused to take Serevent because it made him feel jittery, but Dr. Uchida increased his Flonase to assist with nasal congestion, and instructed him to start taking Sudafed. (R. 160-61.)

Mr. Gardner next saw a doctor at the University of Illinois on July 21, 2003. He complained of sinus pain with occasional headaches, fatigue and nasal discharge. The doctors instructed him to continue using Flonase and gave him a prescription for Prevacid for his acid reflux. (R. 240-42.) Less than two months later, on September 9, 2003, Mr. Gardner had a pulmonary function test that revealed an $FVC$[1] of 4.87 and an $FEV_1$[2] of 3.30, with an overall ratio of 67%.[3] (R. 239.) On September 22, 2003, Dr. Uchida told Mr. Gardner to wear a respirator while performing his welding job. (R. 158.)

Mr. Gardner went to the University of Illinois on October 21, 2003, complaining of occasional wheezing and some exertional shortness of breath. He acknowledged, however, that he could walk a mile. Dr. Kamran Mahmood diagnosed mild to moderate persistent asthma and prescribed Singulair. Mr. Gardner also agreed to try Serevent again. The medical notes indicate that, as of

---

[1]     FVC, or Forced Vital Capacity, is the total volume of air forced out of the lungs. (*See* http://www.nationaljewish.org/disease-info/tests/spirometry.aspx.)

[2]     $FEV_1$, or Forced Expiratory Volume in the first second, is the amount of air forced out in the first second. This indicates whether there is an airway obstruction. (*See* http://www.nationaljewish.org/disease-info/tests/spirometry.aspx.)

[3]     In healthy adults, the ratio of $FEV_1$ to FVC is usually around 70%. (*See* http://meded.ucsd.edu/isp/1998/asthma/html/spirexp.html.)

that time, Mr. Gardner had been switched to a place at work where he was not in direct contact with paint or welding anymore. (R. 236-37.) Mr. Gardner continued to exhibit asthma symptoms in November 2003, including coughing and wheezing, and he sought treatment at Stroger Hospital on November 21, 2003 for an asthma attack triggered by walking. He also continued to experience post-nasal drip and gastroesophageal reflux disease ("GERD"). (R. 154, 233-35.)

On December 7, 2003, Mr. Gardner went to the Holy Cross Hospital ("Holy Cross") complaining of shortness of breath and a cough that produced yellow phlegm. The doctor gave him Flovent, Serevent and Albuterol. (R. 303-12.) Five days later on December 12, 2003, Mr. Gardner presented at the University of Illinois with "on and off wheezing" and a cough that had lasted for two weeks. Dr. Brian Macaulay diagnosed "Acute exacerbation of Asthma" and acute bronchitis, and instructed Mr. Gardner to take Albuterol every four hours as needed. (R. 231-32, 270-76.) On December 16, 2003, Dr. Mahmood began seeing Mr. Gardner on a more regular basis when he presented for treatment at the University of Illinois. Dr. Mahmood noted that Mr. Gardner's asthma was uncontrolled on his current therapy, requiring frequent emergency room visits. He referred Mr. Gardner to allergy/immunology for a "skin test for screening for allergic asthma," and continued his treatment for post-nasal drip and GERD. (R. 229-30.) By December 30, 2003, Dr. Mahmood believed "[t]here is some element of anxiety" to Mr. Gardner's asthma, "as he does not have any wheezing on exam" and his spirometry was not consistent with airway obstruction. (R. 225-26.)

**2.      2004**

On January 9, 2004, Mr. Gardner underwent a CT scan of his chest at the University of Illinois. The test was "unremarkable," showing that his lungs were clear and that he did not have bronchiectasis. (R. 218, 287.) The next day, Mr. Gardner went to Holy Cross complaining of back pain relating to a motor vehicle accident he had that day. An x-ray of his lumbosacral spine was normal, and the doctors recommended that he use a heating pad. (R. 309-16.) Dr. Mahmood's treatment notes dated January 13, 2004 essentially mirror those from December 30, 2003, again

4

noting an element of anxiety to Mr. Gardner's asthma.  (R. 220-21.)  On January 27, 2004, Dr.

Mahmood referred Mr. Gardner for a psychiatric evaluation to assess whether he had "anxiety

related asthma symptoms."  At Mr. Gardner's request, Dr. Mahmood also gave him a letter stating

that he needed to be off work for six weeks.  (R. 214-15.)

On March 2, 2004, Mr. Gardner returned to the University of Illinois.  Dr. Mahmood's

treatment notes reflect that the allergy/immunologist had determined that Mr. Gardner's asthma was

not related to allergies.  (R. 207.)  He had some minimal blood in his sputum, but Dr. Mahmood

noted that it was "[j]ust one episode" and "[u]nlikely to be related to pulmonary dis[ease]."  (R. 208.)

Ten days later on March 12, 2004, Mr. Gardner requested more disability from Dr. Mahmood, but

the doctor found that he "does not qualify" and noted that he had not seen a psychiatrist as

recommended.  (R. 199.)

The next day, Mr. Gardner was evaluated by a University of Illinois psychiatrist.  (R. 203.)

The doctor diagnosed him with an adjustment disorder with anxiety, and ruled out "panic attacks

versus physiologic anxiety reaction related to respiratory problems."  The doctor referred Mr.

Gardner to the general psychiatry clinic, and noted that he may do well with behavioral therapy,

such as relaxation techniques.  The doctor recommended caution with anxiety medication given Mr.

Gardner's history of polysubstance abuse, but also noted that medication was not clearly indicated

at that time.  (R. 203-04.)  Shortly thereafter, on March 19, 2004, Dr. Mahmood recommended that

Mr. Gardner not work where he is exposed to dust or fumes unless he is wearing a protective mask.

(R. 198.)

On April 1, 2004, Mr. Gardner underwent a consultative examination with Peter Biale, M.D.

Dr. Biale found that Mr. Gardner's left shoulder was painful, but that he had no limitation.  Dr. Biale

diagnosed bronchial asthma and hypertension, and noted that Mr. Gardner was "status post motor

vehicle accident."  (R. 354-58.)  On May 5, 2004, Mr. Gardner returned to Stroger Hospital.  Dr.

Uchida indicated that anxiety "may be a major factor" in Mr. Gardner's emergency room visits, and

gave him a prescription for Prozac. Mr. Gardner's asthma and hypertension were both "well controlled" at that time. (R. 157.) Two weeks later on May 19, 2004, Mr. Gardner presented at Stroger Hospital with "fairly mild asthma." Dr. Uchida's impression was that Mr. Gardner suffered from anxiety with possible hyperventilation. (R. 156.)

Mr. Gardner went to the University of Illinois on June 1, 2004, and reported that he "exercises, joined the YMCA. Swims a lot." (R. 192.) A chest x-ray revealed "mildly increased AP [anteroposterior] diameter and flattening of the diaphragms suggesting obstructive lung disease." (R. 185, 405.) Dr. Jacqueline Angles recommended that Mr. Gardner continue taking Advair and Albuterol for asthma, and Clarinex and Flonase for his symptoms of nasal congestion. He was also given a prescription for the antibiotic Augmentin. (R. 193.)

On June 4, 2004, Dr. Uchida completed a Physical Residual Functional Capacity Questionnaire, noting that he had been treating Mr. Gardner every two to three months since February 2001. Dr. Uchida reported that Mr. Gardner had been diagnosed with hypertension, mild asthma, hepatitis C, and anxiety, and opined that overall he was healthy, "except for anxiety." (R. 317.) In reaching this conclusion, Dr. Uchida observed that Mr. Gardner had a normal spirometry, no wheezing, and no interstitial lung disease based on a high resolution CT scan. (*Id.*) Dr. Uchida opined that Mr. Gardner "should not have" shortness of breath or wheezing given his impairments and concluded that he is capable of low stress jobs. Dr. Uchida indicated that Mr. Gardner is not limited in his ability to walk; he can sit and stand for more than two hours at a time; he can sit and stand/walk for at least six hours in an eight-hour workday; he can frequently lift up to 20 pounds and occasionally lift 50 pounds; he can frequently twist, stoop, crouch and climb ladders and stairs; and he has 100% manipulation in both hands. (R. 318-20.) Dr. Uchida agreed that Mr. Gardner was likely to have "good days" and "bad days," which would "go[] in streaks." (R. 320.)

On June 29, 2004, Mr. Gardner went for a scheduled follow-up appointment at Stroger Hospital. The attending physician noted that Mr. Gardner had no problems or concerns with his

6

asthma at that time, but he needed instructions on the proper use of his Albuterol inhaler. (R. 145.) Approximately one month later, on July 27, 2004, Dr. Mahmood certified that Mr. Gardner was cleared to return to work "in an environment where he is not exposed to paint, welding or fumes, or other triggers for his asthma." (R. 189.) A pulmonary note from the same date indicated that Mr. Gardner was feeling much better and working at a warehouse where he was minimally exposed to dust and not exposed to any fumes. He still had exertional shortness of breath but could walk a mile. (R. 187.) Between August 31 and November 9, 2004, Mr. Gardner was treated by John Jay Shannon, M.D. at the University of Illinois. (R. 397-404.) Dr. Shannon's notes are difficult to read, but his assessment on November 9, 2004 was that Mr. Gardner had "no asthma." (R. 402.)

On September 9, 2004, William Conroy, M.D. performed a Physical Residual Functional Capacity Assessment of Mr. Gardner. (R. 343-50.) Dr. Conroy indicated that Mr. Gardner could occasionally lift 50 pounds; frequently lift 25 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; push and pull without limitation; and work in an environment with extreme cold, heat, wetness, humidity, noise and vibration. Dr. Conroy concluded, however, that Mr. Gardner needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards. (R. 343-47.)

Mr. Gardner underwent a consultative psychiatric evaluation on September 28, 2004. He told John W. O'Donnell, M.D. that he had seen a psychiatrist one time in May or June of 2004 but was not prescribed any medication. He discussed his past substance abuse problems but confirmed that he has been sober since 1996. (R. 321-22.) In addition, Mr. Gardner reported that he was feeling better since taking Albuterol in a nebulizer, and that he had not gone to the emergency room since April of that year. (R. 322.) Mr. Gardner told Dr. O'Donnell that at that time, he cleaned his own apartment, did light cooking and laundry, hung out at his mosque "practically all the time," and read books, magazines or the Koran. (R. 323.)

Dr. O'Donnell observed that Mr. Gardner was mildly anxious at times but it was "not sustained." He was able to repeat a series of six numbers forwards and three numbers backwards; performed well on questions testing his general "fund of knowledge"; and did well with calculations, though he had difficulty with abstract thinking. (R. 324-26.) Dr. O'Donnell diagnosed depressive disorder; anxiety disorder; polysubstance abuse in full sustained remission; personality disorder; and a history of asthma, hepatitis C and hypertension. Dr. O'Donnell indicated that Mr. Gardner's prognosis was "guarded." (R. 326.) A Lung Examination performed the same day was normal. (R. 328.)

On October 22, 2004, Joseph Mehr, Ph.D. completed a Psychiatric Review Technique Form indicating that Mr. Gardner's depressive and anxiety disorders were not severe, and that he had only mild restrictions in his activities of daily living, and in maintaining social functioning, concentration, persistence and pace. (R. 329-42.) A few weeks later on November 10, 2004, Dr. Uchida examined Mr. Gardner and opined that he did not have asthma but, rather, was somatizing. (R. 360.)

### 3.     2005

On January 5, 2005, Dr. Uchida noted that Mr. Gardner still felt short of breath but was improved. Dr. Uchida opined that the asthma symptoms were exacerbated by anxiety/somatization. He "strongly encouraged" Mr. Gardner to return to work, but to avoid exposure to dust and fumes. (R. 376-77.) A couple of weeks later on January 18, 2005, Mr. Gardner returned to the University of Illinois for a follow-up appointment. The attending physician noted that Mr. Gardner's moderate persistent asthma was uncontrolled, and that he was confused about the use of his medications. The doctor re-instructed him in that regard. (R. 417-18.) On April 6, 2005, Mr. Gardner told Dr. Uchida that he felt depressed, had no energy, and was having "weird dreams," all of which Mr. Gardner attributed to being out of work. (R. 378.)

In a pulmonary treatment note dated May 17, 2005, Dr. Mahmood stated that Mr. Gardner had resumed his welding job but had "an exhaust system" and "minimal exposure to smoke." (R. 419.) Dr. Mahmood recommended that he continue using Serevent and Flovent and that he switch jobs if possible. He also advised Mr. Gardner to use a mask at his job and to avoid dust and fumes. (R. 420.) On July 29, 2005, Mr. Gardner told Dr. Uchida that his asthma was worse on very hot days. Dr. Uchida indicated that an asthma diagnosis was "unclear," and that anxiety was contributing to the condition. Dr. Uchida further noted that Dr. Shannon felt Mr. Gardner did not have asthma, while Dr. Mahmood felt he did. (R. 380.)

Approximately one month later on August 18, 2005, Mr. Gardner returned to the University of Illinois with a cough. His shortness of breath was better and he was still using Albuterol three to four times per day. (R. 421.) Dr. Todd Sheppard opined that Mr. Gardner's mild persistent asthma was "in an exacerbation" and gave him Advair 500/50. (R. 422.) By October 25, 2005, Mr. Gardner told Dr. Sheppard that his shortness of breath was much better, his coughing symptoms were rare and he had no evening symptoms with the higher-dose Advair. (R. 424.) A spirometry performed the same day showed that Mr. Gardner's overall breathing ratio was 73.84 %. (R. 427.) In a follow-up with a pharmacy student, also that same day, however, Mr. Gardner reported that he had been experiencing increased shortness of breath, chest tightness and pain, and some wheezing. (R. 428.) During a follow-up call with a pharmacist on November 10, 2005, Mr. Gardner reported that he "feels well" and his symptoms "have been controlled w[ith] Advair." He also stated that he had only used Albuterol twice in the previous two weeks. (R. 429.)

**4.    2006**

On January 5, 2006, Dr. Uchida noted that Mr. Gardner was experiencing a lot of stress due to the loss of his job, but that his asthma was stable. Mr. Gardner complained of wrist and back pain, and Dr. Uchida again noted symptoms of depression and anxiety, prompting him to arrange for a psychiatric referral. (R. 382.) Adedapo Williams, M.D. conducted a psychiatric consultation of Mr. Gardner on January 24, 2006. Mr. Gardner reported symptoms of depression starting when he lost his job two years earlier, including depressed mood; increased appetite; sleep disturbance; fatigue; feelings of worthlessness, hopelessness and helplessness; and poor concentration. Mr. Gardner stated that he suffered panic attacks once per week lasting for approximately 30 minutes, and he acknowledged that his doctors could find no medical basis for some of his physical symptoms. (R. 383.)

Dr. Williams found that Mr. Gardner's thought process was logical and goal directed, but that he tended to focus on his distrust of doctors and his physical complaints. Dr. Williams diagnosed major depressive disorder and panic disorder, and prescribed Hydroxyzine and Paroxetine to alleviate these symptoms. (*Id.*) He also gave Mr. Gardner a global assessment of functioning ("GAF") score of 65. (R. 432.) Dr. Williams noted a variety of symptoms at that time, including depressed mood, increased appetite, sleep disturbance, fatigue, poor concentration, and feelings of worthlessness and helplessness. (R. 435.)

On February 24, 2006, Mr. Gardner told Dr. Uchida that he was experiencing right flank pain that had lasted for three days. Dr. Uchida noted that Mr. Gardner's asthma was under control but that his hypertension was not, and he encouraged him to take the Paroxetine. (R. 385.) On April 13, 2006, Mr. Gardner told Dr. Williams that he was doing well and either not having panic attacks or having them less frequently. Mr. Gardner showed no depressive or psychotic symptoms at that time, and his mental status examination was "unremarkable." (R. 436.) Less than one month later, on May 9, 2006, Dr. Sheppard from the University of Illinois completed a Pulmonary Residual

Functional Capacity Questionnaire on Mr. Gardner. (R. 393-96.) Dr. Sheppard stated that he had been treating Mr. Gardner for one year, and diagnosed asthma with only a mild obstruction on Advair. Symptoms included shortness of breath, wheezing and episodic acute asthma occurring once per month and lasting for two days, with no emotional factors contributing to the severity of the symptoms. (R. 393-94.) Dr. Sheppard indicated that Mr. Gardner could tolerate moderate stress and had a good prognosis, but "should avoid dust + allergen exposure." (R. 394.)

According to Dr. Sheppard, Mr. Gardner was capable of sitting and standing for more than two hours; sitting for six hours in an eight-hour workday; and standing or walking for four hours in an eight-hour workday. Mr. Gardner could frequently lift 20 pounds; frequently twist, stoop and crouch; and occasionally climb ladders and stairs. (R. 395.) In addition, Mr. Gardner needed to avoid all exposure to extreme cold and heat; avoid concentrated exposure to high humidity, wetness and cigarette smoke; and avoid even moderate exposure to perfumes, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust and chemicals. (R. 396.) Dr. Sheppard opined that Mr. Gardner's impairments were likely to produce "good days" and "bad days," and stated that he would be absent from work about one day per month. (*Id.*)

On May 10, 2006, Dr. Williams saw Mr. Gardner for the purpose of completing a Mental Impairment Questionnaire. Dr. Williams noted that Mr. Gardner was doing well except that he reported having a panic attack "a few days ago." (R. 437.) On the questionnaire, Dr. Williams stated that he had been treating Mr. Gardner once every three months since January 24, 2006. Dr. Williams diagnosed major depressive disorder and panic disorder, listing unemployment and multiple medical problems as stressors. He gave Mr. Gardner a GAF score of 45 but noted that he had a "good response" to Paroxetine. (R. 387.) Dr. Williams reported that Mr. Gardner experienced drowsiness and stomach upset from his medication, and that he had a "depressed mood, increased appetite, poor sleep, fatigue, worthlessness, hopelessness, helplessness, poor concentration" and panic attacks once per week. Dr. Williams opined that Mr. Gardner's prognosis was fair/good. (*Id.*)

With respect to Mr. Gardner's specific symptoms, Dr. Williams checked off boxes for appetite disturbance, decreased energy, feelings of guilt or worthlessness, mood disturbance, difficulty concentrating or thinking, and persistent disturbances of mood or affect. (R. 388.) Dr. Williams also found Mr. Gardner "seriously limited, but not precluded" in all 25 mental abilities and aptitudes needed to do unskilled work. (R. 389-90.) Despite being given space on the questionnaire to explain these findings, Dr. Williams left those areas blank. He opined that Mr. Gardner had moderate restriction in his activities of daily living; moderate difficulties in maintaining social functioning; moderate deficiencies of concentration, persistence or pace; and one or two episodes of decompensation per year. (R. 391.) Dr. Williams concluded that Mr. Gardner would miss about two days of work per month due to his mental impairments. (R. 392.)

## B.    Mr. Gardner's Testimony

Mr. Gardner testified that he worked as a welder until his asthma symptoms forced him to stop in or about 2003. He transferred to spot welding and/or line packing for some period of time, but had to stop in early 2004 when the company told him he could no longer wear a respirator. (R. 452-53.) The company next gave him a job hanging parts, but he had trouble with the fumes and had to quit after a few months. (R. 453, 457-58.) In 2005, Mr. Gardner worked for a temporary agency for approximately one month. He performed spot welding for two weeks and then moved to a warehouse where he assembled video racks and moved boxes. The company fired him for working too slowly. (R. 450-51.) According to Mr. Gardner, all of these jobs required him to be on his feet for eight hours a day, and he had to lift more than 50 pounds when welding, and between 30 and 50 pounds when hanging parts. (R. 453-55.)

Mr. Gardner stated that he lives in the basement of a building where other family members reside. (R. 459.) He sometimes cooks and is able to keep his unit clean and do laundry, but has to be careful about cooking grease, chemicals and other odors. (R. 460.) He is also able to take

public transportation and do some grocery shopping.  (R. 461-62.)  Mr. Gardner cannot, however, do yardwork due to allergies and asthma attacks caused by fresh cut grass.  (R. 460-61.)

When the ALJ asked Mr. Gardner why he feels he cannot work, Mr. Gardner stated that the medications he takes for asthma, high blood pressure, depression, panic disorder, anxiety, reflux and allergies make him drowsy.  (R. 463-64.)  He indicated that he lays down once or twice a day and naps "all the time," and he noted that if he sits still, then he "get[s] to dozing off and, want[s] to sleep" because he does not have anything to do.  (R. 470, 472-73.)  Mr. Gardner acknowledged that he can walk three or four blocks and does not have "a big problem" standing.  (R. 473.)  He also stated that he can lift between 20 and 40 pounds.  (R. 474.)

Mr. Gardner testified that he experiences asthma attacks about once or twice per month, though his doctors tell him some of his breathing problems are panic attacks.  He first stated that the attacks can last hours, depending on their severity, but later testified that an asthma attack typically lasts between 30 minutes and one hour.  (R. 476-78, 481.)  As for his back, Mr. Gardner said that he does not have any problems despite being diagnosed with mild spine degeneration. Mr. Gardner acknowledged that Dr. Sheppard and Dr. Uchida both told him that he is capable of performing office work, but noted that he does not have the skills for such positions.  (R. 481-83.) He also mentioned the need to use the bathroom frequently, and drowsiness from his medications. (R. 483, 485.)  With respect to his feelings of worthlessness, Mr. Gardner testified that they began after he stopped working and started taking a variety of medications.  He also indicated that he lives in an unsafe neighborhood, which causes him to feel "edgy" and experience elevated blood pressure.  (R. 487-88.)

## C.    Vocational Expert Testimony

Cheryl Hoiseth testified at the hearing as a vocational expert ("VE").   To assist in determining whether Mr. Gardner is capable of working, the ALJ asked the VE several hypothetical questions.  The first hypothetical involved an individual of Mr. Gardner's age, education and work

13

experience who could (1) frequently lift and carry up to 20 pounds; (2) sit up to six hours; (3) stand and walk up to four hours; (4) frequently push and pull up to 20 pounds; (5) occasionally climb ladders and stairs; (6) frequently stoop, twist, crouch and crawl; and (7) perform simple, routine tasks at a production rate pace; but needed to (8) avoid all exposure to extreme heat and cold; (9) avoid concentrated exposure to high humidity, wetness and cigarette smoke; (10) avoid even moderate exposure to pulmonary irritants, including perfumes, soldering fluxes, solvents, cleaners, fumes, odors, gases and dust; and (11) be absent from work one day per month. (R. 493.) The VE testified that such an individual could not perform any of Mr. Gardner's past relevant work, but could perform several light jobs available in the national economy, including stock clerk (8,300 jobs), shipping clerk (20,000 jobs) and information clerk (1,400 jobs). (R. 494.)

The ALJ's second hypothetical was identical to the first except that the individual would need to miss two days of work each month. The VE stated that this was "on the edge" but still "generally tolerable," such that her answer remained the same. (R. 494.) The ALJ's third hypothetical returned to one absence per month, added that the individual could perform at a non-production rate pace, and left all other factors the same. The VE testified that such an individual could not perform Mr. Gardner's past work, but could perform the jobs identified in the first hypothetical. The VE further indicated that there was no distinction between her opinion and the Dictionary of Occupational Titles ("DOT"). (R. 495.)

On cross-examination, Mr. Gardner's counsel noted that the DOT classified the stock clerk position as heavy, not light. The VE conceded that the DOT listed the jobs differently than her sources, which included the U.S. Department of Labor ("DOL") and the Illinois Department of Employment Security ("IDES"). (R. 496-97.) The VE further acknowledged that under the DOT framework, only six of the 20 shipping clerk jobs were classified as light work, including routing clerk and car checker. As a result, the VE revised the number of available shipping clerk jobs from 20,000 down to 4,000. The VE then admitted that she had "grossly overestimated" the number,

which was actually 2,700.  (R. 500-03, 507-08.)  Finally, the VE concluded that there are 2,450 telephone quotation clerk jobs and 2,450 motor vehicle transportation information clerk jobs available to an individual with Mr. Gardner's residual functional capacity.  (R. 514-15.)  The VE explained that in her opinion, "just about anything can match the DOT," so she preferred to rely on her own experience with the jobs in question.  (R. 501.)

With respect to work absences, the VE stated that an individual with three unexcused absences in a six-month period generally receives a verbal warning.  An individual with four unexcused absences in that amount of time receives a written warning; five unexcused absences results in a written warning plus suspension; and six unexcused absences results in termination. (R. 510-11.)  The VE also stated that when a person has just started a job and is in the probationary period, some companies allow less than one full-day absence in the first month.  (R. 509.)  The VE did not have any official source, however, establishing that employers utilize this series of disciplinary actions.  (R. 510-11, 516-17.)

## D.    The ALJ's Decision

The ALJ found that Mr. Gardner's asthma, hypertension, major depression, panic disorder and history of polysubstance abuse in full sustained remission since 1997, are all severe impairments, but that they do not meet or equal one of the impairments listed in the Social Security Regulations.  (R. 23-24.)  The ALJ determined that Mr. Gardner has the residual functional capacity ("RFC") to perform simple, routine tasks at a non-production rate pace, involving: (1) frequently lifting and/or carrying up to 20 pounds; (2) standing and/or walking up to four hours, and sitting up to six hours in an eight-hour workday; (3) frequently pushing and/or pulling up to 20 pounds; (4) occasionally climbing ladders and stairs; and (5) frequently twisting, stooping and crouching.  The ALJ further limited Mr. Gardner to working in an environment that avoids all exposure to extreme temperatures; concentrated exposure to high humidity and wetness; and even moderate exposure to pulmonary irritants, including perfumes, soldering fluxes, solvents, cleaners, fumes, odors, gases

15

and dust.  The ALJ also accepted that Mr. Gardner would be absent from work one day per month.  (R. 24.)

In reaching this conclusion, the ALJ discussed the extensive medical record, but relied primarily on the opinion of treating physician Dr. Sheppard.  (R. 24-26.)  The ALJ gave less weight to the opinion of Dr. Williams because it was "not consistent with his treatment notes and offers no factual basis for its conclusory findings."  (R. 26.)  Specifically, the ALJ noted that Dr. Williams's treatment notes from April 13, 2006 stated that Mr. Gardner was doing well, and either had no panic attacks, or less frequent attacks.  Dr. Williams further opined that Mr. Gardner showed no depressive or psychotic symptoms at that time, and his mental status examination was "unremarkable."  (R. 25, 436.)  Less than one month later, however, Dr. Williams reported that Mr. Gardner was "seriously limited, but not precluded" in all 25 mental abilities and aptitudes needed to do unskilled work, and suffered numerous symptoms of depression and anxiety.  (R. 25, 389-90.)  In addition, Dr. Williams found Mr. Gardner moderately limited in his activities of daily living, social functioning, concentration, persistence and pace, and reported two episodes of decompensation, but provided no factual basis for these conclusions.  (R. 25-26.)  As a result, the ALJ determined that Mr. Gardner was only mildly restricted in his activities of daily living and social functioning, though moderately limited in his ability to maintain concentration, persistence and pace.  (R. 26.)

The ALJ found Mr. Gardner's testimony at the hearing credible as to his description of his asthma attacks.  The ALJ accepted that Mr. Gardner experiences asthma attacks once per month, lasting between 30 and 60 minutes, and noted that he had not gone to the hospital for an attack in the previous year.  (*Id.*)  In this regard, the ALJ gave less weight to Dr. Sheppard's contrary opinion that the asthma attacks could be expected to last two days.  (*Id.*)  The ALJ also found Mr. Gardner's statements concerning the intensity, persistence and limiting effects of his medical symptoms "not entirely credible."  (R. 24.)

In determining that Mr. Gardner has the RFC to perform a significant number of jobs available in the national economy, the ALJ relied on the VE's testimony that he could work as a stock clerk (8,300 jobs), telephone quotation clerk (2,450 sedentary jobs) and motor vehicle transportation clerk (2,450 light jobs).  (R. 27-28.)  The ALJ acknowledged that the VE relied on the DOL and IDES statistical references for stock clerk positions at the light level, but found these sources "more applicable to the facts of this case."  (R. 28.)

## DISCUSSION

### A.      Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act.  *See* 42 U.S.C. § 405(g).  In reviewing this decision, the court may not engage in its own analysis of whether Mr. Gardner is severely impaired as defined by the Social Security Regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted).  Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner."  *Id.* (citation omitted).  The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence."  *Id.* (citing 42 U.S.C. § 405(g)).  Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion."  *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision."  *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted).  The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion."  *Young,* 362 F.3d at 1002.  Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

17

## B. Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act.[4] *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008); *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C. Analysis

Mr. Gardner raises three main arguments in support of his request for a reversal and remand: (1) the ALJ failed to properly consider his mental impairments; (2) the ALJ erred in finding his testimony not entirely credible; and (3) the VE's testimony was unreliable. The court addresses each in turn.

---

[4] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.* The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq.*

1.      **Mr. Gardner's Mental Impairments**

     a.      **Dr. Williams's Assessment**

Mr. Gardner argues that the ALJ erred by failing to consider his mental impairments as set forth by Dr. Williams. Specifically, Dr. Williams reported that Mr. Gardner is moderately limited in his activities of daily living and in social functioning, but the ALJ found that Mr. Gardner is only mildly limited in those areas, which is consistent with the opinion of consulting physician Joseph Mehr. In Mr. Gardner's view, the ALJ was required to accept Dr. Williams's assessment as a treating physician. (Pl. Mem., at 13, 14.)

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). A claimant is not disabled simply because his treating physician says so. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Id.* (*quoting Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)). If a treating physician's opinion is not entitled to controlling weight, the ALJ considers several factors in determining the weight to give the opinion, including: the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, the degree to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist. 20 C.F.R. § 404.1527(d)(2)-(5).

Here, the ALJ explained that Dr. Williams had provided contradictory information in his treatment notes and on his May 10, 2006 Mental Impairment Questionnaire. Specifically, Dr. Williams stated that as of April 13, Mr. Gardner was "doing well" and either having "no panic attacks" or having "much less frequent" attacks. Dr. Williams found no depressive or psychotic symptoms; noted that Mr. Gardner's mental status exam was "unremarkable"; and concluded that

he was "stable." (R. 25, 436.) In a May 10, 2006 treatment note, Dr. Williams again stated that Mr. Gardner was "doing well" except for a single panic attack a few days earlier, and had "no other depressive [symptoms]" aside from an increased appetite. Dr. Williams reiterated that Mr. Gardner's mental status exam was "unremarkable" and opined that he was "stable." (R. 437.) The same day, however, Dr. Williams stated that Mr. Gardner was having panic attacks once per week; exhibited numerous symptoms of depression; and was "seriously limited" in all 25 areas of mental abilities and aptitudes. (R. 387-92.)

Mr. Gardner argues that there is no inconsistency here, noting that when Dr. Williams first examined him on January 24, 2006, the doctor recorded all the symptoms of depression listed on the May 10 Questionnaire, including a depressed mood; increased appetite; poor sleep; fatigue; feelings of worthlessness, hopelessness and helplessness; poor concentration and weekly panic attacks for the previous two years. There is no explanation in Dr. Williams's report, however, for the fact that (1) his April and May treatment notes reflect that Mr. Gardner was "doing well," "stable," and essentially without *any* depressive symptoms except for a single panic attack and increased appetite; but (2) his simultaneously-completed May Questionnaire reflects that Mr. Gardner was exhibiting every symptom of depression and anxiety as stated in the initial January 2006 treatment note.

Nor is there any medical evidence suggesting that Mr. Gardner ever experienced weekly panic attacks. Dr. Williams only saw Mr. Gardner three times between January 24 and May 10, 2006. Dr. Mahmood referred Mr. Gardner for a psychiatric consult in March 2004, but the doctor observed that he "does not appear to have general anxiety or any spontaneous panic," and opined that such attacks were "not likely as per [history]." (R. 203-04.) There is no evidence that Mr. Gardner pursued further psychiatric treatment at that time. Dr. Uchida mentioned anxiety as a contributing factor in Mr. Gardner's asthma in his May 2004 and January, April and July 2005 treatment notes, but he never stated that the attacks occurred weekly. Notably, he did not deem

it necessary to send Mr. Gardner to a specialist for the condition prior to the January 2006 referral to Dr. Williams. In addition, Dr. Sheppard concluded in May 2006 that emotional factors did not contribute to the severity of Mr. Gardner's asthma symptoms.

In light of the unexplained inconsistencies in Dr. Williams's treatment notes, it was not error for the ALJ to rely on Dr. Mehr's opinion that Mr. Gardner has only mild restrictions in his activities of daily living and in social functioning. As the ALJ noted, Dr. Williams offered no explanation whatsoever for his finding of moderate limitations in those areas. (R. 25-26.) Mr. Gardner contends that the ALJ should have credited Dr. Williams's other conclusions that he is "seriously limited" in all mental abilities and aptitudes needed to do unskilled work, including dealing with stress and getting along with co-workers. (Pl. Mem., at 15-16.) Once again, however, Dr. Williams failed to provide any basis for this assessment. Moreover, Dr. Sheppard found that Mr. Gardner is capable of handling moderate stress, and that emotional factors do not contribute to his functional limitations. (R. 394.) Viewing the record as a whole, the ALJ reasonably concluded that Dr. Williams's opinion was not entitled to controlling, or even substantial weight. *Hofslien*, 439 F.3d at 376.

### b. The GAF Score

Mr. Gardner next argues that the ALJ improperly failed to note that his GAF score dropped from 65 on January 24, 2006 to only 45 on May 10, 2006. (Pl. Mem., at 14; Pl. Reply, at 1-2.) A GAF score of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)." *See Dreyer v. Metropolitan Life Ins. Co.*, 459 F. Supp. 2d 675, 682 (N.D. Ill. 2006) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (rev. 4th ed. 2000)). *See also Jenkins v. Astrue*, No. 1:06-cv-0707-DFH-TAB, 2007 WL 2362982, at *2 n.2 (S.D. Ind. Aug. 14, 2007). Mr. Gardner claims that the ALJ "should

have considered the impact these scores have on Plaintiff's RFC and the support they provide for [Dr. Williams's] opinion."  (Pl. Reply, at 2.)

Contrary to Mr. Gardner's suggestion, the GAF scale is not a diagnosis but is intended to be used to make treatment decisions.  "Neither Social Security regulations nor case law require an ALJ to use a GAF score to determine the extent of an individual's disability."  *Fisher v. Astrue*, No. 1:06-cv-1741-DFH-JMS, 2007 WL 4150314, at *6 (S.D. Ind. Nov. 14, 2007).  *But see Wilson v. Astrue*, 493 F.3d 965, 967 (8th Cir. 2007) ("[T]he GAF and full scale IQ scores are certainly pieces of the hypothetical puzzle necessary to gain an accurate overall assessment of [claimant's] functioning.")  Thus, the ALJ did not err by failing to address Mr. Gardner's specific GAF scores. Notably, the ALJ accepted that Mr. Gardner has mild limitations in social functioning, which is consistent with the January 2006 GAF score of 65.  *See Earl v. Astrue*, No. 2:07-CV-310-PRC, 2008 WL 2078618, at *3 n.2 (N.D. Ind. May 14, 2008) ("A GAF score of 65 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." ; *Grady v. Astrue*, No. 07-421-PMF, 2008 WL 2397583, at *2 n.1 (S.D. Ill. June 10, 2008).  (*See also* R. 432.)

Mr. Gardner is correct that Dr. Williams gave him a GAF score of just 45 in May 2006.  As discussed earlier, however, Dr. Williams's evaluation contains inconsistencies and unexplained limitations that undermine the credibility of this score.  On January 24, 2006, at a time when Mr. Gardner was reportedly exhibiting numerous symptoms of depression and anxiety, Dr. Williams gave him a GAF score of 65.  In April and May 2006, Mr. Gardner was stable and doing well, yet Dr. Williams stated that his GAF score had dropped by 20 points down to 45.  Dr. Williams provided no explanation for this incongruous assessment.  Overall, the court finds no error with respect to the ALJ's treatment of the GAF score.  *Cf. Bartrom v. Apfel*, 234 F.3d 1272 (Table) (7th Cir. 2000) (ALJ erred in finding the claimant to be "a generally stable person who occasionally has a bout of

22

easily treatable depression" where her GAF score ranged from 30 to 55 over a two-year period despite medication, therapy, and 14 visits with her treating physician).

### c. Somatization

Mr. Gardner finally objects that the ALJ should have considered evidence of his somatization disorder. (Pl. Mem., at 16.) No doctor, however, ever diagnosed Mr. Gardner as having such a disorder. Rather, there is a dispute among Mr. Gardner's physicians as to whether his breathing problems are caused by asthma, or by anxiety attacks. (R. 380.) The ALJ properly avoided making any determination as to which physician was accurate, but focused on the symptoms themselves. *Dixon*, 270 F.3d at 1177-78 (ALJ did not "play doctor" where she thoroughly discussed the medical evidence in making her decision). Tellingly, Mr. Gardner did not pursue this argument in his reply memorandum. The ALJ did not play doctor in this case and her findings as to Mr. Gardner's mental impairments are supported by substantial evidence.

### 2. Mr. Gardner's Credibility

Mr. Gardner argues that the ALJ still committed error in this case by crediting his testimony that his asthma attacks only last 30 to 60 minutes while rejecting his testimony regarding the intensity, persistence and limiting effects of his asthma and depressive symptoms. (Pl. Mem., at 17.) In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only

23

if "patently wrong." *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ set forth a variety of medical evidence that contradicted or failed to support Mr. Gardner's testimony that he cannot work due to his asthma, anxiety and depression. A January 9, 2004 CT scan of Mr. Gardner's chest was "unremarkable" and showed that he had clear lungs. An x-ray of his lumbosacral spine taken the next day was also normal. (R. 24.) In May 2004, Mr. Gardner's asthma was "well controlled" and by June he reported exercising and swimming a lot at the YMCA. Dr. Uchida opined on June 4, 2004 that Mr. Gardner was healthy overall at that time, "except for anxiety," and that he "should not have" shortness of breath or wheezing given his impairments. (R. 25.) Dr. Uchida stated that Mr. Gardner had occasional limits on concentration and should not work at a high stress job, but that he had no significant exertional limitations. (*Id.*; R. 318-20.)

On June 29, 2004, Mr. Gardner reported that he had no problems or concerns regarding his asthma, and on July 27, 2004, Dr. Mahmood cleared him for work in an environment free of respiratory irritants. (R. 25.) On September 28, 2004, Mr. Gardner told Dr. O'Donnell that he cleaned, did light cooking and laundry, hung out at his mosque "all the time," and read. A Lung Examination performed the same day was normal, and on January 5, 2005, Dr. Uchida "strongly encouraged" Mr. Gardner to return to work. Mr. Gardner exhibited symptoms of depression and anxiety in April 2005 and January 2006, but his asthma was stable on the latter date. In addition, on May 6, 2006, Dr. Sheppard concluded that, based on his treatment of Mr. Gardner over the previous year, his asthma-related limitations were "minor" and without a contributing emotional component. Dr. Sheppard predicted one asthma attack per month and stated that Mr. Gardner could tolerate moderate stress and had a good prognosis. (R. 25.) As explained earlier, the ALJ fairly discounted Dr. Williams's contrary opinion.

Mr. Gardner objects to the fact that the ALJ adopted all of Dr. Sheppard's findings except for his conclusion that an acute asthma attack would last two days. The ALJ was not "patently wrong" however, in crediting Mr. Gardner's own testimony that his attacks only last 30 to 60 minutes. Mr. Gardner also argues that his ability to do minimal daily activities is not inconsistent with his claim of disability. (Pl. Mem., at 18.) The Commissioner contends that "[t]his is not a case about minimal activities," noting that Mr. Gardner returned to work for a time in 2005. (Def. Resp., at 16.) The court agrees with Mr. Gardner, however, that "[a] person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working." *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). Regardless, the ALJ did not in any way relate her finding of not disabled to the fact that Mr. Gardner worked for one month in 2005. To the contrary, the ALJ merely stated that the work did not qualify as substantial gainful activity. (R. 23.)

As for Mr. Gardner's daily activities, the Seventh Circuit has cautioned against "placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). Here, it is clear from the ALJ's decision that in reaching her conclusion in this case, she relied not only on Mr. Gardner's testimony regarding his daily activities, but also on the extensive medical record, including Dr. Sheppard's opinion. (R. 24-26.)

Mr. Gardner next claims that the ALJ erred in accepting his testimony that the side-effects from his medications have improved without also including "limitations based on th[os]e side effects" in his RFC. (Pl. Mem., at 19.) Mr. Gardner stresses that his medications make him drowsy, that he lays down once or twice a day, that he naps "all the time," and that he needs to use the bathroom when he takes a water pill. (*Id.*) The ALJ expressly mentioned these side-effects, however, and further noted that the doctor had done "some adjusting and changing of his

medications" as a result.  (R. 26.)  The ALJ also accepted that Mr. Gardner would have moderate limitations in his ability to concentrate.

Mr. Gardner suggests that he would need to take unscheduled breaks to use a nebulizer when working, "which would render him off-task frequently enough to interfere with job demands and expectations."  (Pl. Mem., at 19.)   Citing an employment discrimination case, he then speculates that "it is reasonable to assume employers would be reluctant to hire an employee . . . who needs frequent unscheduled breaks."  (*Id.* (citing *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1115 (7th Cir. 1992)) (employer acted with a legitimate, non-discriminatory reason when it terminated an employee who failed to report to work and did not adequately explain his absence).  Mr. Gardner points to no evidence in the record supporting his claim that he needs to take unscheduled breaks.  As noted, Dr. Sheppard opined that Mr. Gardner is in fact capable of sitting and standing for more than two hours at a time; sitting for six hours in an eight-hour workday; and standing or walking for four hours in an eight-hour workday.  (R. 25, 318.)  In addition, the ALJ limited Mr. Gardner to performing work at a non-production rate pace to accommodate his need to work at his own speed.  (R. 24.)

Mr. Gardner finally argues that the ALJ failed to consider his "inability to even get to work due to the likelihood of exposure to . . . environmental hazards."  (Pl. Mem., at 20.)  Mr. Gardner himself testified, however, that he is able to take public transportation, and that family members and members of his mosque drive him places.  (R. 461-62.)  The ALJ provided specific reasons for her credibility findings in this case, and those findings are not "patently wrong."  *Schmidt*, 496 F.3d at 843.

### 3.    The VE's Testimony

Mr. Gardner claims that the case must nonetheless be remanded because the ALJ based her decision on unreliable VE testimony.   He first finds an inconsistency between the ALJ's determination that he will likely miss one day of work per month due to his impairments, and the

VE's testimony that (1) an individual with between three and six unexcused absences in a six-month period faces warnings, suspension and ultimately termination; and (2) even one day's absence during a 30-day probationary period could result in termination. As Mr. Gardner sees it, "the ALJ's own finding of one absence per month . . ., by extrapolation, indicates that such a rate of absence would result in termination." (Pl. Mem., at 21.)

The ALJ does not indicate whether Mr. Gardner's impairment-induced absence each month would be deemed "excused" or "unexcused." (Pl. Reply, at 6.) Regardless, the VE provided absolutely no foundation for her testimony, admitting that "I have nothing to back up . . . those statements." (R. 516.) The VE merely made a vague reference to some notes she took during a seminar in 1996. (R. 516-17.) Under these circumstances, the ALJ did not err in disregarding this aspect of the VE's testimony. *See Perry v. Callahan*, No. 95 C 6728, 1997 WL 529549, at *8 (N.D. Ill. Aug. 14, 1997) ("The ALJ may reject a vocational expert's testimony if he or she finds the underlying premise of the testimony unsupported or contradictory.") Significantly, at the request of Mr. Gardner's attorney, the ALJ gave Mr. Gardner an opportunity to submit additional materials from Hewitt and Associates related to employer tolerance for absenteeism. Mr. Gardner never provided those vocational references. (R. 28.)

Mr. Gardner also suggests that the ALJ failed to resolve the conflicts between the VE's testimony and the Dictionary of Occupational Titles, as required by SSR 00-4p. (Pl. Mem., at 21.) SSR 00-4p provides:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between the VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
>
>> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and if the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

2000 WL 1898704, at *4 (S.S.A. Dec. 4, 2000). *See also Earl*, 2008 WL 2078618, at *11.

Mr. Gardner is correct that the VE identified some jobs that were not consistent with the DOT. As required by the regulations, however, the ALJ fully explored those inconsistencies during the hearing, as did Mr. Gardner's own attorney. (R. 496-518.) *See Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). In her written decision, moreover, the ALJ expressly acknowledged that the VE's opinion "differs from the Dictionary of Occupational Titles (DOT) in some respects," but explained that the VE had relied on the DOL and IDES statistical references. (R. 28.) *See Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) (an ALJ is "permitted to rely on the VE's opinion, even if the VE contradicted the DOT.") Mr. Gardner does not claim that these sources are inherently unreliable. *See, e.g., Beth v. Astrue*, 494 F. Supp. 2d 979, (E.D. Wis. 2007) (no error where the VE relied on data from the Bureau of Labor Statistics and the claimant did not contend the source was unreliable). Indeed, "the DOT is not the only source of admissible information concerning jobs." *Smith v. Apfel*, No. 97 C 3173, 1999 WL 410018, at *4 (N.D. Ill. May 27, 1999) (citing 20 C.F.R. § 416.966(d)) ("[W]e will take administrative notice of reliable job information available from various governmental and other publications.")

Mr. Gardner concedes that the VE's testimony regarding the position of telephone quotation stock clerk is in fact consistent with the DOT, but argues that the ALJ should have disregarded the position because those jobs "do not exist in significant number." In Mr. Gardner's view, the jobs are outdated "because the internet is where people go to get stock quotes." (Pl. Mem., at 22, 23.) The court need not determine the veracity of this argument because the ALJ was entitled to rely on positions identified by the VE that are consistent with the DOT. Indeed, SSR 00-4p imposes an affirmative duty on an ALJ to *confirm* that a VE's testimony is consistent with the DOT and, if not, to obtain an explanation for any discrepancy. *See Hudson v. Social Security Admin.*, No. 3:07-CV-117 CAN, 2008 WL 474207, at *9 (N.D. Ind. Feb. 19, 2008). Here, there is no inconsistency between the VE's testimony and the DOT when it comes to the telephone quotation stock clerk position. Mr. Gardner's theory is thus not a basis for reversal or remand.

With respect to the stock clerk position, Mr. Gardner claims that it is beyond his RFC because under the DOT, it is classified as heavy work.  (Pl. Mem., at 21.)  The ALJ acknowledged as much, but reasonably accepted that the VE had relied on DOL and IDES statistical references, which classify stock clerk as light work.  (R. 28.)  This raises another problem, however: the ALJ concluded that Mr. Gardner is capable of performing light work, but also determined that he can only stand or walk for four hours in an eight-hour workday.  (Pl. Mem., at 22.)  The Regulations define light work as requiring "a good deal of walking or standing," or involving "sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b), 416.967(b).  In addition, SSR 83-10 defines "light work" as standing or walking for six hours in an eight-hour workday and sitting for two hours in an eight-hour workday.  *See also Clifford*, 227 F.3d at 868 n.2.

The ALJ's conclusion that Mr. Gardner is capable of standing and/or walking up to four hours in an eight-hour workday appears inconsistent with the requirement that an individual performing light work must be capable of walking and/or standing for up to six hours in an eight-hour workday.  (R. 24.)  *See Chrisman v. Astrue*, 487 F. Supp. 2d 992, 1001 (N.D. Ill. 2007) ("An RFC for light work requires the ability to walk or stand for six hours in an eight-hour day.")  The ALJ should have clarified with the VE why Mr. Gardner is capable of performing the stock clerk positions despite his limitations on standing and walking.  *See, e.g., Hernandez v. Astrue*, No. 07-2161, 2008 WL 2025088, at *3 (7th Cir. May 13, 2008) (VE fairly explained that claimant who could only stand for two out of eight hours was nonetheless able to perform past light work "as [the claimant] had actually performed the job," based on "information that I saw in the file that the person was able to sit and stand."); *Hill v. Astrue*, No. 2:07-CV-200-PRC, 2008 WL 1818450, at *8 (N.D. Ind. Apr. 22, 2008) ("The ALJ was incorrect to interpret Dr. Dobson's report that Plaintiff could stand and/or walk for at least two hours as an indication that Plaintiff could complete light work, which requires an ability to stand or walk for six hours in an eight-hour workday.")

The same is true with respect to the motor vehicle transportation clerk position identified by the VE. Contrary to Mr. Gardner's assertion, the VE relied on DOT § 237.367-018, an unskilled "Information Clerk (motor trans.)" job, and not DOT § 237.267-010, a semi-skilled "Information Clerk, Automobile Club" job. (Pl. Mem., at 21; R. 514-15; http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02B.htm.) That said, the position is classified as light work. Again, the ALJ should have clarified with the VE why Mr. Gardner is capable of performing the motor vehicle transportation clerk position despite his limitations on standing and walking. *Hernandez*, 2008 WL 2025088, at *3.

This, however, does not end the inquiry. "[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions." *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003). "Harmless errors are those that do not affect an ALJ's determination that a claimant is not entitled to benefits." *Bacidore v. Barnhart*, No. 01 C 4874, 2002 WL 1906667, at *10 (N.D. Ill. Aug. 19, 2002). Even subtracting the light level stock clerk and motor vehicle transportation clerk positions from the list of possible jobs available to Mr. Gardner, there are still 2,450 sedentary telephone quotation stock clerk positions within his RFC. This number satisfies the requirement at step 5 of the analysis. *See Coleman v. Astrue*, 269 Fed.Appx. 596, 2008 WL 695045, at *5 (7th Cir. Mar. 14, 2008) (citing *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993)) ("1,400 jobs falls within the parameters of a sufficiently significant occupational base.")

Mr. Gardner next contends that the ALJ erred by failing to include all of his mental impairments as set forth by Dr. Williams in the hypothetical questions posed to the VE. (Pl. Mem., at 20.) For all the reasons stated earlier, however, the ALJ fairly discounted Dr. Williams's opinion in concluding that Mr. Gardner is mildly limited in social functioning and in his activities of daily living, and moderately limited in the ability to maintain concentration, persistence and pace. Thus, the hypothetical included all of the limitations supported by the record. *See Indoranto*, 374 F.3d at 474 ("If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses

to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record."); *Michael v. Astrue*, 543 F. Supp. 2d 860, 868 (N.D. Ill. 2008) ("The ALJ's failure to acknowledge the hypothetical based on the criteria consistent with exhibit 11F is consistent with the ALJ's rejection of Dr. Iskander's opinion as set forth therein, and therefore is not erroneous for this reason alone.")

More problematic is the fact that the ALJ's hypothetical included a restriction to performing simple, routine tasks at a non-production rate pace, rather than a statement that Mr. Gardner is moderately limited in his ability to maintain concentration, persistence and pace. (Pl. Mem., at 16-17.) "Courts have not reached a clear consensus regarding whether it is appropriate for an ALJ to phrase hypothetical questions about mental residual functional capacity in terms of the work a claimant can perform." *O'Connor-Spinner v. Astrue*, No. 4:06-CV-0171-DFH-WGH, 2007 WL 4556741, at *7 (S.D. Ind. Dec. 20, 2007). In *Young v. Barnhart*, 362 F.3d 995 (7th Cir. 2004), for example, the Seventh Circuit held that a hypothetical limiting the claimant to "simple, routine, repetitive, low stress work with limited contact with coworkers and the public" was "flawed in that it purported to tell the vocational expert what types of work [the claimant] could perform rather than setting forth [the claimant's] limitations and allowing the expert to conclude on his own what types of work [the claimant] could perform." *Id.* at 1002, 1004 n.4.

Where a medical expert translates limitations into a specific residual functional capacity assessment, however, the Seventh Circuit has found that the ALJ may reasonably rely on that opinion in formulating a hypothetical question for the VE. *See, e.g., Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (ALJ's hypothetical limiting the claimant to repetitive, low-stress work was proper where a medical expert translated the ALJ's finding of moderate limitations in the ability to maintain a regular schedule and attendance and to complete a normal workday and workweek without interruptions from psychologically-based symptoms into a specific RFC assessment that

the claimant could still perform low-stress, repetitive work).  *See also O'Connor-Spinner*, 2007 WL 4556741, at *8 (same).

Here, the ALJ did not elicit medical expert testimony confirming that Mr. Gardner's impairments would limit him to simple, routine tasks.  Nor does the record contain specific medical opinions limiting Mr. Gardner in that manner.  Rather, the ALJ drew her own conclusion that "Claimant's residual functional capacity takes into account [his moderate limitations in maintaining concentration, persistence and pace] by allowing for simple routine tasks not performed at a production rate pace." (R. 26-27.)  The Seventh Circuit has suggested that a hypothetical question need not necessarily include every physical and mental limitation, as long as evidence in the record indicates that "the vocational expert independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them."  *Steele*, 290 F.3d at 942.  There is no evidence here, however, that the VE reviewed Mr. Gardner's medical records or other supporting documentation and, as noted, there was no medical expert testimony offered at the hearing.

The hypothetical posed to the VE was flawed and, given the current record, the court is unable to conclude that the error was harmless.  Thus, the case must be remanded on this single issue.

## CONCLUSION

The ALJ's decision is thorough and is supported by substantial evidence in nearly all respects.  For the reasons stated above, however, the hypothetical question posed to the VE was flawed.  Plaintiff's Motion for Summary Judgment or remand [Doc. 16] is therefore granted in part and denied in part.  Defendant's Motion for Summary Judgment [Doc. 25] is denied.  Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: July 15, 2008

*Nan R. Nolan*
_____
NAN R. NOLAN
United States Magistrate Judge